UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

IN RE:

SK FOODS, L.P.,

    Debtor.

SCOTT SALYER, et al.,                  CIV. S-11-2987 LKK

    Appellants,

     v.
                                       O R D E R

SK FOODS, L.P., et al.,

    Appellees.
_____/

    Appellants seek to overturn the Bankruptcy Court's order approving a compromise between the Trustee and the secured lenders. For the reasons set forth below, the Bankruptcy Court order appealed from will be affirmed.

**I. BACKGROUND**

    On or about September 27, 2008, the Bank or Montreal and other secured lenders (collectively, "BMO"), loaned the Debtors $193 million. Excerpts of Record at 00000079 (hereinafter "EOR-79")

////

¶ C.[1]   The loan was secured by all of the Debtor's assets, including their cash and cash proceeds (the "cash collateral") (collectively, all these assets are the "prepetition collateral"). Id.  On May 7, 2009, Debtors filed a petition in the Bankruptcy Court for protection under Chapter 11 (reorganization) of the Bankruptcy Code.  EOR-78 ¶ A.

During the course of the bankruptcy, Debtors filed a motion for an order authorizing them to use BMO's cash collateral so that (1) they could continue to operate the business, as well as (2) prepare for the "Section 363" (11 U.S.C. § 363) sale of the debtors' assets.  See EOR-2.[2]  Because the appeal in this case is concerned with the nature of that sale, as proposed and as executed, the court sets out some of its details here.

Debtors proposed to conduct a "sale of the Debtors' operations as a going concern prior to commencement of the tomato packing season on July 1st."  EOR-5 ¶ 10.  Debtors' stated plan was to sell "substantially all of the Debtors' assets in late June."  Id. ¶ 10. Debtors' stated goal was:

> to close the sale and transfer control and possession of the operations to a buyer with the financial wherewithal to fund operations at the Lemoore and Colusa plants throughout the tomato packing season.

Id. ¶ 10.  The Debtors emphasized that:

> A sale of the assets in June is imperative to preserve the jobs, grower contracts, customer contracts and community of interests dependent on the continued

---

[1] ECF No. 23-5 (EOR-77 to EOR-97).

[2] ECF No. 23-2 (EOR-2 to EOR-16).

operation of the Debtors' plants. Id. ¶ 11.[3]

On June 22, 2009, The Bankruptcy Court granted Debtors' motion in order to "enable the Debtors to continue operating," and to avoid harm to the estate. EOR-79 ¶ E (final order).[4]

In order to protect BMO from any "diminution in the value" of its prepetition collateral that might result from the use of the cash collateral, the Bankruptcy Court granted BMO "adequate protection" in the form of: (1) "replacement liens" against all property of the debtor, prepetition and postpetition (EOR-81 ¶ 4(a)); and (2) a $2 million monthly payment by debtors for the account of the secured lenders (EOR-83 ¶ 4(c)).

Prior to the sale, the Debtors' financial advisor estimated that the total value of the collateral, if sold by June 2009, was $102-$129 million. EOR-126 ¶ 16.[5] This amount was broken down into three components: (1) $60-80 million, which was the valuation of the "fixed assets" which were to be sold in the "going-concern" sale, plus (2) $48-55 million, which was the "liquidation" valuation of the Debtors' accounts receivable and inventory (EOR-125 ¶ 15); less (3) $6 million, which was the amount of the fixed assets belonging to other parties (EOR-133, Exh. A).

---

[3] The Debtors repeated all of these assertions in their motions for approval of bidding procedures to sell the company as a going concern. See EOR-24 ¶¶ 10-11 (ECF No. 23-3).

[4] See also In re SK Foods, Bankr. No. 09-29162, Bankr. Dkt. No. 104 (Bankr. E.D. Cal. May 14, 2009) (interim order).

[5] ECF No. 23-8 (EOR-114 to EOR-135).

In fact, the sale realized only $67 million in proceeds. EOR-125 ¶ 16. BMO, after taking into account $3-13 million it expects to receive as a result of the compromise under appeal, therefore asserts that it received (or will receive) $70-80 million in proceeds from the sale of its collateral plus the compromise proceeds. EOR-126 ¶ 16. BMO asserts that the difference between its asserted value and the amount it actually received (or will receive) is $22-59 million, the amount BMO asserts as its super-priority claim.[6] EOR-129 ¶ 21.

After negotiations, BMO and the Trustee agreed to compromise the super-priority claim at $27.66 million. Id. The Bankruptcy Court approved the compromise, over appellants' objections. EOR-1.[7] The Bankruptcy Court held that under Associates Commercial Corp. v. Rash, 520 U.S. 953 (1997):

> going concern value appears more likely the appropriate measure where, as here, the debtor intended to and did retain and use the collateral up to the time of a § 363 sale.

EOR-985.[8]

---

[6] "The high projected collateral value of $129 million less the low actual recovery of $70 million equals a high of $59 million[;] and the low projected collateral value of $102 million less the high actual recovery of $80 million equals $22 million." EOR-129 ¶ 21.

[7] ECF No. 23-1. In its first decision approving the compromise, the Bankruptcy Court excluded evidence presented by John Brincko, and this court remanded so that Brincko's evidence could be considered. The Bankruptcy Court considered that evidence upon remand.

[8] ECF No. 23-29 (EOR-981 to EOR-996).

4

**II. THE APPEAL**

Appellants now seek to overturn the Bankruptcy Court's approval of the compromise on the sole ground that the Bankruptcy Court erred, as a matter of law, in relying on a $102-$159 million valuation of BMO's collateral. This valuation was the starting point that eventually led to the $22-59 million value of the super-priority claim, and the $27.66 million compromise of that claim. Appellants assert that the valuation of the collateral was based upon its "going-concern" value, when, they assert, the law is crystal clear that its "liquidation" value should have been used. Appellants assert that if the liquidation value had been used, it would be clear that BMO suffered no diminution in the value of its collateral, and thus it was not fair and equitable to compromise this zero-value claim at $27.66 million.

**III. STANDARDS**

    **A.   Approving the Compromise.**

In considering the motion to approve the compromise, the Bankruptcy Court was required to determine if the compromise was "fair and equitable." <u>Woodson v. Fireman's Fund Ins. Co. (In re Woodson)</u>, 839 F.2d 610, 620 (9th Cir. 1988). In passing on the proposed compromise, the bankruptcy court was required to consider:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1381 (9th Cir.), cert. denied, 479 U.S. 854 (1986).[9]

### B. Standard of Review.

The bankruptcy court's approval of a proposed compromise is reviewed for an abuse of discretion. Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.), 255 F.3d 1061, 1065 (9th Cir. 2001).

The bankruptcy court's findings of fact are reviewed under the "clearly erroneous" standard, and its conclusions of law are reviewed de novo. A & C Properties, 784 F.2d at 1381.

In reviewing the Bankruptcy Court's approval, this court keeps in mind that "as long as the bankruptcy court amply considered the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed." A & C Properties, 784 F.2d at 1380.

**IV. ANALYSIS**

In this case, appellants challenge only the first factor – probability of success in litigation. Specifically, appellants assert that BMO had no chance of succeeding in any litigation with the Trustee over the value of the collateral. The reason for this, according to appellants, is that as a matter of law, the collateral valuation should have been based upon its "liquidation" value, not its going-concern valu. Appellants assert that there is no

---

[9] It was the Trustee's burden to persuade the bankruptcy court "that the compromise is fair and equitable and should be approved." A & C Properties, 784 F.2d at 1381.

contrary legal authority to its position, and that therefore the Trustee would be certain to win any litigation with BMO over the super-priority claim.

### A.   The Collateral Valuation - Accounts Receivable and Inventory.

Appellants' assertion that the Bankruptcy Court relied upon the "going-concern" value of these assets, is simply incorrect. As discussed above, the Debtors' financial analyst used the "liquidation" valuation of the Debtors' accounts receivable and inventory. See EOR-125 ¶ 15.  Appellants point to nothing in the record on appeal for their assertion that the "going-concern" valuation was used for this collateral.  Since appellants argue that the liquidation value should have been used, and it was used, appellants have no basis for appeal regarding this part of the compromise.

### B.   The Collateral Valuation - The Fixed Assets.

As Appellants assert, the Bankruptcy Court did rely upon the "going-concern" valuation of Debtors' collateral that were "fixed assets."  The Bankruptcy Court found that a going-concern sale of those assets:

> is what was intended from the outset, it was the basis on which BMO had agreed to the debtor's use of cash collateral, and it is the scenario that actually resulted.

EOR-987. Appellants' sole argument on appeal is that this finding was "clearly erroneous" because the sale was actually a "liquidation." Appellee's Brief (ECF No. 22) at 12 (ECF at 16). However, appellants' entire argument in this regard is relegated

7

to footnote 3 of their brief, in which they argue that the sale was a liquidation, rather than a going-concern sale, because:

> Olam did not purchase accounts receivable, inventory, bank accounts, trade names, employee plans, books and records or other real property other than the two plants.

Id. at 12 n.3. Appellants' Brief at 12 n.3 (ECF at 16 n.3). This is plainly insufficient for the court to find that the Bankruptcy Court was "clearly erroneous" in finding that this was a going-concern sale.

First, appellants have simply listed these omitted items in their brief, without including any evidence about the matter in the record on appeal. This court will not simply accept the appellants' say-so as to what was omitted from the sale. Thus, the factual predicate for appellants' sole argument is simply not in the record, and their argument can be rejected for that reason alone.

Second – assuming the court can rely upon a copy of the sale document provided by the Trustee[10] – appellants do not offer any explanation of the legal or factual significance to be attached to their listing of items omitted from the sale. Rather, appellants simply list items, and assert the conclusion that those items prove that the sale was not a going-concern sale. This "reasoning" fails. Most glaringly, appellants neglect to make any mention of what items were included in the Olam sale.

---

[10] See Trustee's Request for Judicial Notice, Exh. 1 (ECF No. 25-1).

These items include:

- The real estate on which two operating facilities are located;
- Supply inventories relating to "packaging, maintenance, repair and processing operations at the Business;"
- Rolling stock used in connection with the business;
- Fixed assets used in connection with the business, including drums and bins, machinery and equipment, pipelines, spare parts, office furniture and supplies, office and computer equipment and software, and other items in the facilities;
- Assumed contracts for the sale, processing or packaging of tomato-based products;
- Leased equipment, including machinery, rolling stock, motor vehicles and so on;
- Permits (and both sides will cooperate to give the buyer "all the benefits and privileges of such Permit for the Facilities");
- Books and records relating to the business;
- Intellectual property, including the seller's interests in inventions, research and development information, pricing information, marketing plans, recipes, formulas, customer lists, and so on; and
- Wastewater discharge rights;
- The accounting system "used by Seller to carry on the tomato processing business at the Facilities;"
- The inventory "necessary to perform the Contract Packing

Agreement with Authentic Specialty Foods, Inc.;" and

- "Other Rights."

See Trustee's Request for Judicial Notice, Exh. 1 (ECF No. 25-1).

The Bankruptcy Court clearly was aware of the sale, the items included and those excluded from the sale, and concluded that it was a going-concern sale. The items <u>included</u> in the sale certainly permitted the Bankruptcy Court to conclude that the items were being sold with a view to selling the business substantially as an active business with future earning power, and thus a going-concern sale. See Black's Law Dictionary (definition of "value/going-concern value"). Appellants bear the burden of establishing that this finding was clearly erroneous. They have not met that burden.

On the law, the Bankruptcy Court properly relied upon <u>Associates Commercial Corp. v. Rash</u>, 520 U.S. 953 (1997). Under <u>Rash</u>, the assets' valuation "'shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.'" <u>Rash</u>, 520 U.S. at 961, quoting 11 U.S.C. § 506(a)(1).[11] In this case, the valuation of the debtors' assets was done in connection with the Debtors' use of the creditors' cash collateral, enabling the debtor to keep running the business, and in contemplation of the going-concern sale. As discussed above, it is clear that the sale anticipated that the business would be

---

[11] Appellants try to distinguish <u>Rash</u> by arguing that it involved a "cram-down" provision of the Bankruptcy Code. But the distinction is without a difference, because the reasoning and holding of <u>Rash</u> applies here: "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question." <u>Rash</u>, 520 U.S. at 962; 11 U.S.C. § 506(a)(1).

conducted on an on-going basis before and after the sale, not sold off as a liquidation sale, as appellants now argue. The Bankruptcy Court was thus correct to use the valuation that made sense in light of its purpose and the proposed disposition of the assets – a going-concern sale.

**V.   SUMMARY**

The Bankruptcy Court considered all the pertinent material relating to the compromise reached between the Trustee and the secured lenders, including the Brincko Declaration. The court determined that the compromise was fair and reasonable. Appellants' sole basis for arguing that the compromise was not fair and reasonable is that the estate's assets should have been evaluated for their "liquidation" value rather than their "going-concern" value.

As discussed above, the Bankruptcy Court properly relied upon the "liquidation" value for those assets which were to be liquidated, and as required by Rash, properly relied upon the "going-concern" value for those assets which were to be sold as part of the business as a going concern.

Appellants have no factual or legal basis for their appeal. Accordingly, the Bankruptcy Court's order appealed from is **AFFIRMED.**

IT IS SO ORDERED.

DATED: February 22, 2013.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

11